# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 28 2018, 9:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of A.R. and Ma.R. (Minor Children), and

M.R. (Father) and J.R. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 28, 2018

Court of Appeals Case No. 18A-JT-288

Appeal from the Clinton Circuit Court

The Honorable Bradley K. Mohler, Judge

Trial Court Cause Nos.
12C01-1706-JT-175
12C01-1706-JT-176

**Mathias, Judge.**

[1] M.R. ("Father") and J.R. ("Mother") (collectively "the Parents") appeal the Clinton Circuit Court's involuntary termination of their parental rights to their children, A.R. ("Son") and Ma.R. ("Daughter") (collectively the "Children"). The Parents argue that the evidence was insufficient to support the trial court's judgment terminating their parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Daughter was born to the Parents on May 23, 2010, and Son was born on December 2, 2014. Father and Mother were both special education students who did not complete high school. Father is unemployed but receives Social Security Income Disability. Mother has never been employed.

[4] On or about October 27, 2015, the Indiana Department of Child Services ("DCS") were notified that the Children had "little bites all over their bodies, necks, arms, and legs." Appellee's App. p. 4. Indiana pest control inspected the home and stated that the "place was riddled with bedbugs." *Id*. DCS was also notified that the house was filled with stacks of trash, that there was a horrible smell coming from the house, and that the home was allegedly uninhabitable for small children. The Parents were reportedly instructed by building management to clean the home. *Id*.

[5] The Family Case Manager ("FCM") assigned to the case conducted unannounced visits to the home. During the first visit, on November 3, 2015, the FCM found the home littered with debris, the living room did not have a

clear walkway, the Children's beds did not have bedding, Son's crib was not fully assembled, and there was a foul odor in the home. On November 6, 2015, the conditions in the home had improved, but the FCM still witnessed areas of clutter in the house. During a third visit on November 25, the FCM observed that the conditions of the home had declined, and she noticed an overwhelming odor. She also observed that there was old food laying out in the kitchen, garbage on the stove top, and several items laying throughout the home. On December 1, the Parents were aware that the FCM would be coming back, and the conditions had slightly improved, but the odor was still present in the home. On December 4 the FCM found that the conditions had declined again. She also reported that she heard Mother screaming at Daughter as she approached the front door.

[6] The Parents told the FCM during her visits that the conditions of the home were created by the exterminator coming to the home to treat for bedbugs and stated that the home was usually not in the condition that the FCM had observed. The FCM also visited Daughter at school and observed that she had marks on her arms, legs, and torso. Daughter reported that the marks were from bug bites.

[7] On December 8, 2015, DCS filed a petition alleging that the Children where children in need of services ("CHINS"). An initial hearing was held the same day, and a Guardian Ad Litem ("GAL") was appointed. The court reviewed the material allegations against the Parents, and found:

- [T]hat the condition of [the] home is not being maintained [] and it poses a danger to [the Children].
- [T]hat the home did have bed bugs and [Daughter] was bitten.
- [T]hat the coercive intervention of the court is needed to help [] maintain the condition of [the] home.
- [T]hat [the Children are] child[ren] in need of service.

Ex. Vol. I, State's Ex. 1, pp. 6–9.

[8] The court further found that:

The [Children] ha[ve] not been removed and currently reside[] in the home of [the Parents].

**The Court finds that reasonable efforts were made by DCS to prevent or eliminate the need for removal of the [Children] The statements of reasonable efforts as set forth in the pleadings, reports, and documents of DCS and/or all other service providers filed herein are incorporated by reference.**

**The Court finds responsibility for the placement and care of the [Children] is ordered or continues to be ordered to the DCS.**

*Id.* (emphasis in original). The Children were adjudicated CHINS on December 8, 2015.

[9] At the January 11, 2016 dispositional hearing, the court ordered the Parents to, among other things, do the following:

f. [The Parents] will enroll in any program(s) or assessments as recommended by the Family Case Manager [("FCM")] or other

service provider within thirty days and participate in the program as directed without delay or missed appointments.

*** 

j. [The Parents] will maintain suitable, safe and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities.

*** 

l. [The Parents] will secure and maintain a legal and stable source of income, which may include employment, public assistance, Social Security and/or child support payments that are adequate to support all the household members, including [the Children].

m. [The Parents] will assist in the formulation and put in place a protection plan which protects [the Children] from abuse or neglect from any person.

n. [The Parents] will see that the [Children are] properly clothed, fed and supervised. If [the Children are] of school age, [the Parents] will see that [the Children are] properly enrolled/ registered and attending school or provide verification that the child is participating in an approved educational program. [The Parents] will fully cooperate with the [Children's] school regarding any issues concerning [the Children].

*** 

s. [The Parents] will ensure that [the Children] become[] engaged in a home-based counseling program referred by the [FCM]. All members of the family are to actively participate to the extent recommended by the provider and DCS. The family will

demonstrate positive changes in their lives as a result of the counseling.

t. [The Parents] will complete a parenting assessment and successfully complete all recommendations developed as a result thereof.

u. [The Parents] will complete a psychological evaluation as referred and approved by DCS and successfully complete any recommendations as a result thereof.

***

x. [The Parents] will not allow the use of physical discipline on [the Children] and will demonstrate the ability to appropriately parent [the Children] using alternate means of discipline.

y. [The Parents] will see that any person(s) responsible for physical care or custody of the [Children] is first approved by the [FCM]. These persons must abide by all the terms of this [CHINS] matter, provide age appropriate supervision and care at all times, including, but not limited to providing all medical care prescribed by medical personnel.

z. [The Parents] will provide the [C]hildren with a safe, secure and nurturing environment that is free from abuse and neglect and be an effective caregiver who possesses the necessary skills, knowledge and abilities to provide the [C]hildren with this type of environment on a long-term basis to provide the [Children] with permanency.

Ex. Vol. I, State's Ex. 1, pp. 11–20.

On March 4, 2016, DCS filed a petition to remove the Children from Parents' home and place them in the care of their paternal grandmother, T.R. ("Grandmother"). A hearing was held on March 8, 2016, and the court found the following:

> 2.    The following facts and circumstances have occurred since the [January 11] dispositional decree was entered:
>
> - DCS received reports from the home[-]based care workers, Tim Adams ("Adams") and Melissa Ruffino ("Ruffino"), on January 21 and 22, 2016, and February 10, 2016, that the conditions of the home have declined to the extent that the home is unsafe for the [Children].
> - DCS also has received reports that [Son] had injuries that were not reported to DCS and bug bites that were not being treated.
> - DCS has received reports that [Daughter] has been having behavior problems at home and school that the [P]arents are unable to manage.
>
> 3.    The dispositional decree is modified as follows:
>
> - VISITATION: [The Parents] will attend all visitations with the [Children] and comply with all visitation rules and procedures set forth by DCS or the service provider coordinating and/or supervising the visits.
>
> The Court finds this modification to be the least restrictive and most family like setting and it is in the [Children's] best interest[s].

*Id.* at 21–26.

[11] Over the course of the next year, DCS submitted periodic progress reports concerning their observations and evaluations of visitations between the Parents and Children to the court. The FCM reported, in relevant part, that:

> DCS has concerns about [the Parents'] ability to parent children. There were several incidents where service providers were in the home and observed [Son] chewing on a plugged[-]in vacuum cord with an exposed wire, eating old food, sitting in a soiled diaper that appeared as if hasn't been changed for hours and [Son] putting pencils into his mouth. On numerous occasions [P]arents had to be told what they are allowing [the Children] to do was unsafe and many times [the Parents] did nothing to stop it.
>
> There were injuries that [Son] received that [the Parents] couldn't explain and recurring bites on different areas of [Son's] body.
>
> [Daughter], who is a kindergartner, had displayed some serious behavior issues at school. [Daughter] has been suspended four times within a month's time. She has torn up the classroom, hit and kicked other students, the teacher, and the assistant principal. On one occasion she took her clothes off in front of the class.
>
> ***
>
> Since March 04, 2016[,] FCM has observed [the Parents] making some improvements in maintaining home conditions and parenting/engaging skills. However, DCS still has serious concerns about the lack of supervision. Home base[d] providers have reported on numerous occasion[s] that [the Parents] were not paying attention during visits. There were incidents where [Son] was about to run in the road, down a flight of stairs, was running around a parking lot unattended and the service provider

had to catch him. During a supervised visit at the park on September 13, 2016[,] [Son] ran into the road and cars actually had to stop to keep from hitting him. On September 20, 2016[, Mother] attempted to commit suicide by overdosing on pills. FCM spoke with [Mother] who stated that the reason she tried to commit suicide was because she was tired of DCS and wanted the pain to go away. Throughout the life of this case [P]arents have not displayed that they are capable of keeping the [C]hildren safe. Visits were suspended due to the lack of supervision and DCS not knowing what state of mind [Mother] is in.

Ex. Vol. I, State's Ex. 3, p. 37.

[12] The FCM reports also noted that daughter had been diagnosed with Attention Deficit Hyperactivity Disorder, Post-Traumatic Stress Disorder, Oppositional Defiant Disorder, and Other Specified Trauma and Stressor Related Disorder. *Id.* at 21, 29, 38, 47, 57, 72, 88. Daughter had behavioral issues at school which included pinching other children's bottoms, pushing and shoving other children, covering a child's mouth and nose with her hands, not following directions, apparent disinterest in learning, failing to complete classroom assignments, destroying the classroom, playing in her own feces, spitting out gum and candy and throwing it at the teacher, flipping her desk over, chasing and poking a student with a pencil, and throwing a pencil at the teacher. *Id.* at 88–89.

[13] The Parents underwent psychological evaluations performed by a licensed clinical psychologist ("LCP"). With regard to Mother, the LCP concluded in relevant part the following:

[Mother's] tested intelligence is below average to well below average. Her academic skills are generally in keeping with her tested intelligence. . . . [Mother] experiences difficulties with attention, concentration, memory, planning, and organization; however, she may lack self-awareness as to the nature and severity of these deficits. Also, [Mother's] reported history is remarkable for childhood trauma, family instability, and recurrent episodes of depression with self-injurious behavior, suicidal ideation, and at least one suicide attempt in September 2016.

In regard to parenting, these findings raise potential concerns about [Mother's] judgment, decision making, problem solving, planning, organization, and ability to stay on task. In addition, her reported history of depression and her personality style (based on test results) raise potential concerns about her emotional stability as a parent.

With respect to treatment, it is recommended that [Mother] continue with current mental health and case management services. The findings from this evaluation suggest that progress is likely to be slow and will occur in incrementally small steps with little generalization from one situation to another. Providers will need to intervene in a very concrete and behavior specific manner. Frequent rehearsal and repetition will be necessary for new learning to take place. Even with services, it is quite possible that [Mother] will require ongoing support and guidance in meeting the needs of [the Children].

Ex. Vol. I, State's Ex. 4, p. 7.

[14]   With regards to Father, the LCP concluded in relevant part that:

[Father's] tested intelligence is significantly below average. His academic skills are somewhat higher than expected, perhaps

owing to twelve years of formal education. Even so, [ . . . ] there are also indications of pervasive deficits in executive functioning with respect to attention, concentration, memory, planning, and organization. In addition, the findings from the current evaluation suggest that [Father] is chronically depressed and anxious with prominent dependent personality features.

Taken as a whole, these findings raise concerns about [Father's] ability to function capably as a parent without ongoing support. Cognitively, [Father's] parenting is likely to be compromised in areas of judgment, decision making, problem solving, planning, organization, and ability to stay on task. His chronic depression and dependent personality features also raise concerns about [Father's] willingness and ability to meet the demands and responsibilities associated with parenting two small children.

[Father's] cognitive deficits are such that new learning will be slow, arduous, and limited in scope. Providers will need to intervene in a very concrete and behavior specific manner. Frequent rehearsal and repetition will be necessary for new learning to take place, and there will probably be little generalization across situations. [Father's] depression and dependent personality features may also be potential obstacles to new learning as they directly impact motivation, persistence, and willingness to take on new responsibilities.

It is recommended that [Father] continue with current mental health and case management services. It could be of benefit to increase the frequency of [Father's] therapy sessions to weekly so as to provide additional support. However, progress is likely to be slow and limited in scope for the aforementioned reasons. As [Father] noted during his interview, "I think I'm getting good help, but the things they try to teach me don't sink in." Therefore, it is quite possible that [Father] is going to require ongoing support, guidance, and assistance in meeting the needs of [the Children].

Ex. Vol. I, State's Ex. 5, pp. 7–8.

[15] Due to the Parents' failure to demonstrate the ability to develop the skills necessary to properly parent the Children, DCS filed a petition to terminate the parent-child relationship between the Parents and the Children. After the fact-finding hearings on August 30, 2017 and November 21, 2017, the court found in pertinent part that:

> 5.  That there is a reasonable probability that continuation of the parent-child relationship will pose a threat to the well-being of [the Children]. As noted above and by all involved in the case, [the Parents'] cognitive limitations prevent them from adequately supervising the [C]hildren and ensuring the [C]hildren's safety. As such, continuing the parent-child relationship will pose a threat to the [Children's] well-being. Any further delay in providing the [Children] permanency will pose a threat to the [Children's] well-being. The need for permanency is certainly a factor in determining whether termination is in the [Children's] best interest[s]. Finally, the GAL testified that the [C]hildren were bonded to [Grandmother] and adoption was in [the Children's] best interests.
>
> 6.  That is in the [Children's] best interests that the parent-child relationship be terminated. The FCM, [] and the GAL [], testified that termination of the [Parents'] parental rights was in the [Children's] best interests. []
>
> 7.  That there is a satisfactory permanency plan for [the Children], i.e. adoption[.]

Appellant's App. Vol. II, pp. 23–24 (internal citations omitted). Therefore, on December 27, 2017, the court issued its order terminating Mother's and Father's parental rights. The Parents now appeal.

## Standard of Review

[16] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship, only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[17] Here, the trial court entered specific factual findings and conclusion when it terminated Mother's and Father's parental rights. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

[18] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Matter of M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[19] Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[20]    "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260–61 (Ind.2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[21]    Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Because we find it to be dispositive, we will limit our review to Parents' allegations of error pertaining to subsections (b)(2)(B)(ii), namely, whether DCS proved by clear and convincing evidence that the continuation of the parent–child relationship poses a threat to the well-being of the Children.

## I.  Threat to Children's Well-Being

[22]    Termination of parental rights is proper where the Children's emotional and physical development is threatened. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. The court need not wait until the Children are harmed

irreversibly such that their physical, mental, and social development is permanently impaired. *Id.*

[23] A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[24] Here, Parents argue that the evidence was insufficient to establish that a continuation of the parent-child relationship poses a threat to the Children's well-being. Although the Parents have complied with the trial court's order to participate in services, attended visitations, and have a desire to care for the Children, the record substantially demonstrates that Parents lack the ability to adequately parent the Children. Specifically, DCS continuously reported that "parents had some serious safety, engagement and lack of supervision concerns." Ex. Vol. I, State's Ex. 3, p. 55.

[25] During supervised visits Father had little interaction with the Children. For example, while Children were visiting Parents, Father was observed to be sitting looking at DVD's by himself for approximately 20 minutes at a time. *Id.*

On May 25, 2016, the visit supervisor had to inform Father that Son was climbing on a table and "running out of the play area towards a flight of stairs in the library." *Id*. Father was not aware that Son had run away until the visit supervisor informed him. On May 26, 2016, Son was running in the parking lot of an Aldi, and Parents failed to respond appropriately. On the same day, Son picked up an empty can that was sitting on the ground at a park and attempted to drink from it. Parents were talking with each other, failed to stop Son from trying to drink from the can, and the visit supervisor had to intervene.

[26] Moreover, the FCM reported that the Parents do not "understand the majority of the information provided to them during Parent Management Training and have yet to incorporate anything provided during the case management into their parenting time." *Id*. at 56. Throughout November 2016, Father continually showed a lack of involvement with the Children and made comments about "not wanting the [C]hildren back and being okay with not seeing them all the time." *Id*.

[27] Mother provides the majority of education and interaction, but still continues to struggle with providing appropriate discipline or re-direction. *Id*. at 56–57. On November 9, 2016, Mother tried to get Daughter to use the restroom, but Daughter refused to move, and Mother began yelling at her and pulled forcefully on her arm on three occasions. *Id*. at 57.

[28] Daughter developed substantial behavior issues while in the care of the Parents. For example, at school Daughter removed all of her clothing in the classroom,

pinched other children's bottoms, pushed and shoved other children at school, did not follow the directions of her teachers, failed to complete classroom assignments, and does not show interest in learning. Ex. Vol. I., State's Ex. 3, p. 85. Parents failed to appropriately discipline Daughter to correct these behavioral issues, and the behavioral issues did not subside until Daughter was placed in Grandmother's care. It is unlikely this behavior will improve if Children are returned to Parents because even with services, Parents will have difficulty in supporting and meeting the needs of the Children. Ex. Vol. I, State's Ex. 4, p. 7; State's Ex. 5, p. 8.

[29] Under these facts and circumstances, we conclude that the evidence is sufficient to support the trial court's finding that continuation of the parent-child relationship poses a threat to the Children's well-being.[1] Parents' arguments are simply a request that we reweigh the evidence, which we will not do.

## II. Best Interests of the Children

[30] The Parents argue that the trial court erred when it concluded that termination was in the Children's best interests. "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to

---

[1] In their reply brief, Parents assert that the trial court's acknowledgment of the Parents' cognitive deficits is equivalent to Indiana's prior eugenics law. Reply Br. at 4. We strongly disagree. Eugenics involves involuntary sterilization of an individual. The instant case involves parents who have already conceived and failed to provide for their children. A court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *In re D.D.*, 804 N.E.2d at 266. After reviewing the record, we conclude that DCS presented clear and convincing evidence to support the trial court's decision to terminate parental rights, beyond the Parents' mental deficits.

provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied.* "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

[31] Here, Parents have demonstrated that even after completing and complying with court ordered reunification services, they are still unable to develop the skills necessary to adequately care for the Children. Furthermore, multiple service providers testified that termination is in the Children's best interests. The Children's GAL testified, "[i]t's my opinion that [it is] in the best interest[s] of the [] [C]hildren that [] the parental rights do need to be [] terminated so that [] the [C]hildren can be adopted by [] paternal grand[mother]." Tr. p. 94. The FCM testified that he agreed that termination of parental rights is in the best interests of the Children at this time. *Id.* at 109. Moreover, the Children are well-adjusted with Grandmother, Daughter's behavioral issues have subsided since she has lived with Grandmother, and the permanency plan provides that Grandmother will adopt the Children. Therefore, based on the totality of the evidence, we conclude that there is sufficient evidence to support the trial court's determination that termination of Mother's and Father's parental rights is in the Children's best interests.

# Conclusion

[32] For these reasons, we conclude that the trial court did not err when it terminated Mother's and Father's parent-child relationship with Daughter and Son. Accordingly, we affirm.

Bailey, J., and Bradford, J., concur.